**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| POWERWAVE TECHNOLOGIES, INC., | ) | Case No. 13-10134 (MFW) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| CHARLES A. STANZIALE, JR., | ) | |
| Chapter 7 Trustee of Powerwave | ) | |
| Technologies, Inc., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 15-50085 (MFW) |
| | ) | |
| SUPERIOR TECHNICAL RESOURCES, INC.,) | | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION</u>**

Before the Court is a Motion for Summary Judgment filed by
Superior Technical Resources, Inc., (the "Defendant") in an
adversary proceeding brought by Charles A. Stanziale (the
"Trustee") in the bankruptcy case of Powerwave Technologies, Inc.
(the "Debtor").  The Trustee's complaint seeks, <u>inter alia</u>, to
avoid and recover alleged preferential transfers.  In its Motion,
the Defendant does not dispute that the transfers were
preferential.  Instead, the Defendant raises the ordinary course
of business and subsequent new value defenses under section
547(c)(2) and (4).  Because there are genuine issues of material
fact precluding summary judgment, the Court will deny the Motion.

I.    BACKGROUND

      A.    Procedural Background

      The Debtor filed a voluntary petition under chapter 11 on
January 28, 2013.  Shortly thereafter, the Court entered an order
granting the Debtor's motion to convert the case to chapter 7.
The Trustee was appointed to administer the case.

      On January 23, 2015, the Trustee filed a complaint against
the Defendant seeking to avoid and recover $383,336.55 in
transfers (the "Transfers") that the Debtor made to the Defendant
between October 31, 2012, and January 28, 2013.  (Adv. D.I. 1, at
¶ 15.)  The Defendant filed an Answer and Affirmative Defenses,
and discovery was conducted thereafter.  On July 13, 2016, the
Defendant filed a Motion for Summary Judgment on the grounds that
the ordinary course of business and subsequent new value defenses
applied to the Transfers.  Briefing is now complete, and the
matter is ripe for consideration.

      B.    Factual History

      The Defendant is in the business of supplying workforce
solutions and outsourcing around the world.  On September 12,
2008, the Defendant entered into an Employment Agency/Executive
Search Firm Agreement (the "Agreement") with the Debtor, which
required the Defendant to provide the Debtor with temporary
contract personnel.  At the time, the Debtor manufactured and
marketed antennas, boosters, combiners, and other equipment and

2

devices for wireless communication systems.  The Agreement was renewed in 2009, 2010, 2011, and 2012.

Invoices were sent to the Debtor from the Defendant stating that payment for services was due 45 days from the invoice date. The Debtor typically paid multiple invoices with each payment, which were sent via wire transfer.  Notices specifying which invoices were being paid were also wired to the Defendant.  At times, when the Debtor was late making payments, the Defendant would send the Debtor emails identifying which invoices remained outstanding and asking when payment would be made.

In November 2012, the Defendant's employees corresponded about the Debtor's aging account needing to be paid as it was almost $200,000.  On December 7, 2012, the Defendant sent an email to the Debtor notifying it that the payment terms were being changed from net 45 to net 7, informing the Debtor that its account fell into a high risk category, and demanding payment in full by the close of business on December 12, 2012.  The Debtor wired $63,711.42 to the Defendant on December 12 and thereafter made weekly payments until the petition date totaling $34,580.75. These amounts are included in the Transfers the Trustee seeks to avoid.

II.   <u>JURISDICTION</u>

This Court has subject matter jurisdiction to resolve this

proceeding "to determine, avoid, or recover preferences."  28
U.S.C. §§ 1334 and 157(b)(1) and (2)(F).  In this case, the Court
is not entering a final order because factual disputes remain.


III.  <u>DISCUSSION</u>

    A.   <u>Legal Standard</u>

    Rule 56(c) of the Federal Rules of Civil Procedure is made
applicable to adversary proceedings through Rule 7056 of the
Federal Rules of Bankruptcy Procedure, which sets forth the
applicable summary judgment standard.  Fed. R. Bankr. P. 7056;
Fed. R. Civ. P. 56(c).  Summary judgment may be granted only "if
the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." Fed. R. Civ. P. 56(a).  <u>See also</u> <u>Celotex Corp. v.</u>
<u>Catrett</u>, 477 U.S. 317, 323 (1986) (indicating that the party
moving for summary judgment has the initial burden of
demonstrating the absence of a dispute of material fact).
Admissions in pleadings, affidavits, and discovery and disclosure
materials on file, including all factual inferences derived
therefrom, are viewed in the light most favorable to the
nonmoving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 247 (1986).

    Once the movant presents sufficient proof in support of the
motion, the burden shifts to the nonmoving party to show that

"genuine issues of material fact still exist and that summary judgment is not appropriate." Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.), 514 B.R. 426, 429 (Bankr. D. Del. 2014). Mere allegations are not enough to establish a genuine issue of material fact. Id. There must be sufficient evidence upon which a reasonable trier of fact could return a verdict in favor of the nonmoving party. Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.), 426 B.R. 106, 109 (Bankr. D. Del. 2010). See also Anderson, 477 U.S. at 248-51 (explaining that a factual dispute occurs when reasonable minds could disagree on the result). A court will neither weigh the evidence nor determine the truth of the matter during the summary judgment phase; instead, it must deny the motion for summary judgment when a genuine issue of material fact is demonstrated. Elrod Holdings, 426 B.R. at 109.

    B.   Parties' Arguments

    The Defendant asserts that summary judgment should be granted in its favor as a matter of law because there is no dispute of material fact. It is the Defendant's position that the ordinary course of business defense applies to the Transfers. In the event that some transfers fall outside that defense, the Defendant argues that the subsequent new value defense applies to those remaining Transfers.

    The Trustee disagrees and contends that there are factual

5

disputes precluding summary judgment on both defenses. Specifically, the Trustee argues that the Defendant's methods for determining which Transfers were made in the ordinary course of business creates factual disputes.  The Trustee also asserts that the Defendant engaged in unusual collection activity during the preference period, which precludes a finding that the payments were in the ordinary course of business.  Moreover, the Trustee argues that the subsequent new value defense cannot be decided before the Court makes a determination as to the applicability of the ordinary course of business defense.

For the reasons set forth below, the Court agrees with the Trustee that there are genuine factual disputes precluding summary judgment in the Defendant's favor.

1.  <u>Ordinary Course of Business Defense</u>

The Defendant asserts that, even if the Transfers were preferential, they were made in the ordinary course of business and, therefore, are not avoidable.

Section 547(c) prevents a trustee from avoiding a transfer

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was -
    (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
    (B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

6

The ordinary course of business safeguard is designed to
balance the debtor's and creditor's respective interests.  Elrod
Holdings, 426 B.R. at 111.

> On the one hand the preference rule aims to ensure that
> creditors are treated equitably, both by deterring the
> failing debtor from treating preferentially its most
> obstreperous or demanding creditors in an effort to
> stave off a hard ride into bankruptcy, and by
> discouraging the creditors from racing to dismember the
> debtor.  On the other hand, the ordinary course
> exception to the preference rule is formulated to
> induce creditors to continue dealing with a distressed
> debtor so as to kindle its chances of survival without
> a costly detour through, or a humbling ending in, the
> sticky web of bankruptcy.

Fiber Lite Corp. v. Molded Acoustical Prod., Inc. (In re Molded
Acoustical Prod., Inc.), 18 F.3d 217, 219 (3d Cir. 1994).

The BAPCPA Amendments made the elements for the ordinary
course of business defense disjunctive, thus allowing a creditor
to prove either the subjective element under section 547(c)(2)(A)
or the objective element under section 547(c)(2)(B).  Pereira v.
United Parcel Serv. of Am., Inc. (In re Waterford Wedgewood), 508
B.R. 821, 827 (Bankr. S.D.N.Y. 2014).

In this case, the Defendant asserts that the Transfers are
not avoidable under either prong.  The Defendant has the burden
of proof on both elements.  Id.

Neither party disputes that the Transfers were made based on
debt that the Debtor incurred in the ordinary course of business.
The Debtor typically conducted its operations with temporary
personnel that the Defendant supplied pursuant to the Agreement.

7

Their dispute is whether either section 547(c)(2)(A) or section 547(c)(2)(B) applies.

a.  <u>Subjective Test</u>

Courts examine the following factors to determine whether the subjective ordinary course of business defense under section 547(c)(2)(A) applies: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the preferential payments were tendered in a manner different from previous payments; (4) whether there appears to have been unusual action by the creditor or debtor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (e.g. obtaining additional security) in light of the debtor's deteriorating financial condition.  <u>Sass v. Vector Consulting, Inc. (In re Am. Home Mortg. Holdings, Inc.)</u>, 476 B.R. 124, 135-36 (Bankr. D. Del. 2012).

A creditor must establish a baseline of dealings between it and the debtor that can be compared to their dealings during the preference period.  <u>Davis v. R.A. Brooks Trucking Co. (In re Quebecor World (USA), Inc.)</u>, 491 B.R. 379, 386 (Bankr. S.D.N.Y. 2013).  Late payments do not prevent a court from finding that section 547(c)(2)(A) applies when there is a pattern of late payments in both the historical and preference periods, thereby showing their ordinariness.  <u>Elrod Holdings</u>, 426 B.R. at 111.

8

Consistency among the payments made is all that is required. Liebersohn v. WTAE-TV (In re Pure Weight Loss, Inc.), 446 B.R. 197, 205 (Bankr. E.D. Pa. 2009). A fact-intensive analysis is undertaken to decide whether differences in payments are significant enough to preclude the ordinary course of business defense from applying to the transfers at issue. Id.

          i.   Establishing the Historical Period

Here, the Defendant and the Trustee rely on different time frames for their historical periods. It appears that the Defendant uses October 27, 2011, through October 11, 2012,[1] and the Trustee uses January 1, 2011, through October 30, 2012. It is the Trustee's position that the longer pre-preference period more accurately depicts the payment history because it includes a time when the Debtor was in a stronger financial position.

It is well-established that the historical period should encompass "the time period when the debtor was financially healthy." Quebecor, 491 B.R. at 387. This is the time frame before the debtor started experiencing financial problems. See Moltech Power Sys., Inc. v. Tooh Dineh Indus., Inc. (In re Moltech Power Sys., Inc.), 327 B.R. 675, 680 (Bankr. N.D. Fla.

---

[1]    In its Motion for Summary Judgment, the Defendant states that the historical period is between January 28, 2011, and January 29, 2012. (Adv. D.I. 44 at 18.) However, when asserting that its calculations prove that the Transfers were made in the ordinary course, the Defendant refers to Exhibit C, which shows the historical period as October 27, 2011, to October 11, 2012. (Adv. D.I. 44 at 12, 18; Adv. D.I. 43, Ex. C.)

2005).

In this case, the Debtor's revenue declined from $175.6 million in January 2011 to $42.1 million in September 2012. The Debtor started operating at a net quarterly loss in October 2011. Both the Defendant and the Trustee's historical periods include the time when the Debtor's financial health was deteriorating. However, the Defendant does not include a sustained period when the Debtor was financially sound.

Thus, the Court concludes that a factual dispute exists as to the appropriate historical period to be applied. This precludes granting the Defendant's Motion for Summary Judgment. See id. ("[W]hether a given transaction was within the subjective ordinary course of business that had developed between the parties is a broad, fact-based inquiry requiring historic examination of the parties' pre-preference period relations.").

ii.  Ordinariness of the Transfers

Even if there was no dispute about the historical period to use, the Court finds that a factual dispute exists as to whether the methodologies that the Defendant used prove that the Transfers are consistent with those made during the proper historical period or that any differences are insignificant.

Payments made during the preference period do not have to "possess a rigid similarity to each past transaction"; however, there must be "some consistency." Menotte v. Oxyde Chem., Inc.

10

(JLS Chem. Corp.), 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010).
"[T]here is no single formula the [c]ourt must use" when deciding
whether preferential transfers were made in the ordinary course
of business. Id. A variety of mathematical processes that
include the range, averages, and weighted percentages may be
appropriate. Moltech Power, 327 B.R. at 681 ("[T]he court may
use any or all of these mathematical methods as tools by which to
determine what the ordinary course of business between the
parties actually was.") (internal citations omitted).

     In the instant case, the Defendant uses the range and the
batch methodologies while the Trustee relies on the dollar-
weighted average days sales outstanding method (the "DSO
Method"), inter-quartile approach, and standard deviation. Each
computation is addressed in turn.

1.  Range Method

     The Defendant asserts that the range approach shows that
$324,723.06 in Transfers are not avoidable. According to the
Defendant's calculations, the range between the invoice date and
the payment date is 34 to 371 days for the historical period and
5 to 265 days for the preference period. It is the Defendant's
position that payments falling within the historical period's
range are ordinary.

     The Trustee disagrees with the use of the range methodology
asserting that it creates a factual issue as to the proper

baseline of dealings for the historical period.  According to the Trustee, the broadness of the range and the multitude of invoices paid over time diminishes the value and credibility of the range approach as applied to the Transfers.

The Court agrees with the Trustee that there is a material issue of fact as to the proper baseline and the range method's applicability.  In Quebecor, the bankruptcy court rejected the range method's application as "impermissibly expansive."  491 B.R. at 387.  The Quebecor court explained that the proposed range method "capture[d] outlying payments that skew[ed] the analysis" for what may be ordinary.  Id. at 387-88.  The same may be true here.  Over a thousand invoices were paid during the Defendant's historical period.  The payments made in the upper and lower bounds of the range might be aberrations.  The Defendant did not demonstrate how those outlier payments were accounted for in its calculations or explain why their inclusion was appropriate.

Instead, the Defendant simply cites cases to show that other courts have considered the range method when deciding whether preferential transfers are, in fact, ordinary.  However, the cases are distinguishable because the range used in this case (34 to 371 days) is much broader than what was at issue in those cases.  See Am. Home Mortg., 476 B.R. 124, 138 (Bankr. D. Del. 2012) (range of 7 to 67 days after the invoice date); Elrod

12

Holdings, 426 B.R. at 110 (range of 35 to 73 days after the invoice date); JLS Chem., 424 B.R. at 581 (range of 0 to 33 days from the invoice date); Bridge Assoc. v. C & D Marine, LLC (In re Torch Offshore, Inc.), Adv. No. 07-1001, 2008 WL 2475746, at *3 (Bankr. E.D. La. June 18, 2008) (ranges of 65 to 168 days and 45 to 135 days from the invoice date); Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.), 271 B.R. 456, 461 (Bankr. D. Del. 2002) (range of 0 to 31 days after the due date); H.L. Hansen Lumber Co. of Galesburg v. G & H Custom Craft, Inc. (In re H.L. Hansen Lumber Co. of Galesburg), 270 B.R. 273, 278 (Bankr. C.D. Ill. 2001) (the outer limit for the range was 74 days after the invoice date); Jensen v. Raymond Bldg. Supply Corp. (In re Homes of Port Charlotte, Florida Inc.), 109 B.R. 489, 491 (Bankr. M.D. Fla. 1990) (range of 28 to 76 days after the invoice date).  The Defendant's range (34 to 371 days) greatly exceeds the range in those cases, thus making it inappropriate.

Furthermore, it appears that the Debtor stopped making payments between June 1 and September 12, 2012, even though the Debtor was still using the Defendant's services.  (Adv. D.I. 45, Costich Decl., Ex. A at 22.)  When the Debtor resumed payments, the number of days between the invoice dates and payment dates were naturally higher than prior to June 1, 2012.  It appears that the Defendant made no adjustments for this interruption in

13

payment.  Therefore, there are genuine disputes of material fact
regarding the range method's appropriateness, which preclude
summary judgment in this case.

### 2.  Batch Method

The Defendant also used the batch method to assert that
$325,739.05 in Transfers are not avoidable.  Each batch
represents a payment that the Debtor made to the Defendant.
Multiple invoices were paid with each payment, and the number of
invoices paid varied from batch to batch.  The Defendant
calculated the average age of invoices paid in each batch and,
from these, derived a standard deviation range.

The Trustee disagrees with the Defendant's batch and
standard deviation approach and asserts that it creates a
misleading and inaccurate depiction of what Transfers are
ordinary.

The Court agrees with the Trustee.  The number of invoices
paid per batch ranged from one to 133, with the Debtor paying
more invoices per batch during the preference period than in the
pre-preference period.  (Adv. D.I. 45, Costich Decl., at 8.)  The
Defendant did not account for this variation.  As a result, the
Court concludes that there are disputed facts regarding the
appropriateness of the batch method.

### 3.  DSO Method

The Trustee argues that the DSO Method is appropriate for

14

deciding whether the ordinary course of business defense applies. According to the Trustee, this methodology shows that $303,506.35 in Transfers were made outside of the ordinary course of business.  The DSO Method involves multiplying the total amount of an invoice by the number of days that it took to be paid. That number is then divided by the total amount of the invoices in that batch.

According to the Trustee's calculations, the DSO Method established that the dollar-weighted average of the days outstanding for the payments received in the historical and preference periods is 64.6 days and 88.0 days, respectively.  The Trustee also found that 88.77% of the dollars paid during the historical period occurred within 75 days from the invoice date whereas only 44.05% of dollars paid during the preference period occurred within the same time frame.  Moreover, the Trustee calculated that less than 1% of invoices were paid within 50 days from the invoice date during the historical period, but over 19% of invoices were paid in less than 50 days during the preference period.  Thus, the Trustee takes the position that the Transfers were not made in the ordinary course of business.

The Defendant asserts that, even if the DSO Method is appropriate, the difference of 23 days between the historical and preference periods does not prevent the Transfers from being ordinary.  Assuming arguendo that the Court agrees with the

15

Defendant, there is still a factual dispute as to the proper time frame for the historical period, which might impact the DSO Method calculations.

### 4.    Inter-quartile Range Method

The Trustee also calculated the inter-quartile range for payments made during the historical and preference periods. According to the Trustee, 50% of the invoices were paid between 47 and 62 days.  Thus, it is the Trustee's position that Transfers falling outside that range are not ordinary.  The Defendant disagrees with the application of the inter-quartile range on the basis that there is no precedent in this jurisdiction for that methodology.

The Court disagrees with the Defendant's assertion that the lack of acceptance of that method precludes its use.  There is no set mathematical formula to determine whether preferential payments were made in the ordinary course.  Rather, courts may consider a variety of mathematical formulas when deciding the consistency among payments.  See JLS Chem., 424 B.R. at 681. Before the Court can decide whether the inter-quartile's approach is appropriate, however, factual issues remain as to the proper range for the pre-preference period.

### 5.    Standard Deviation Method

The Trustee performed a standard deviation analysis that

compared the payment patterns in the historical period to the preference period and found that $214,675.77 in Transfers were made outside the ordinary course of business.  In calculating the standard deviation, the Trustee found that the average days outstanding in the historical period was 66.56 days with one standard deviation of 37.2 days, thus creating a low and high range of 29.36 and 103.77 days, respectively.  The Defendant does not address this argument.

Nonetheless, the Court is unable to accept the Trustee's conclusions because a factual issue remains as to the proper time frame for the historical period.

### iii. The Remaining Factors

Even if a proper baseline period had been established, other factual disputes exist as to whether the factors show that the Transfers are subject to a defense under section 547(c)(2)(A).

For example, the parties disagree as to whether the Defendant engaged in unusual collection activity.  "Subsection 547(c)(2) protects those payments that do not result from unusual or extraordinary debt collection practices."  McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.), 210 B.R. 27, 36 (N.D.N.Y. 1997) (internal quotations omitted).

The Trustee argues that the Defendant engaged in unusual debt collection practices when it changed the Debtor's credit

terms and sent multiple emails to the Debtor about late payments. The Trustee notes that the Defendant's November emails indicate that it was nervous about the Debtor's aging account approaching $200,000.  Also, the Trustee relies on the December 7 email, which changed the credit terms and stated that the Debtor's aging account was to be paid in full, as evidence of unusual collection activity.  According to the Trustee, the Debtor's subsequent $63,711.42 wire transfer and the weekly payments made thereafter prove that the Defendant's conduct was coercive.

The Defendant disputes neither the change in credit terms nor the emails.  Rather, the Defendant contends that the aforementioned conduct does not preclude its ordinary course of business defense.  The Defendant asserts that, even if the change in credit terms was unusual, case law suggests that the ordinary course of business exception will still apply so long as the Debtor did not change the way payments were made.  See, e.g., Elrod Holdings, 426 B.R. at 112 (finding that there was no unusual collection activity when call logs showed that the creditor threatened to withhold future shipments until payment was received because (1) the debtor's method of payment remained the same, (2) it was not unusual for the creditor to call the debtor about late payments, and, (3) generally, creditors are allowed to use remedies at their disposal).  But see Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.),

18

463 B.R. 302, 306 (Bankr. D. Del. 2012) (deciding that there was unusual collection activity when there was a tightening of credit terms, a change in communication practices, and a modification of payment deliveries).

Because the Court cannot determine whether the payments made after the Defendant's collection activity were in the ordinary course of business, the Court finds that there is a genuine factual dispute surrounding the Defendant's collection activities that precludes summary judgment.

        b.   <u>Objective Test</u>

In the alternative, the Defendant asserts that the Transfers were made pursuant to ordinary business terms according to industry standards, thus satisfying section 547(c)(2)(B). The Trustee disagrees and contends that there are factual disputes regarding the applicable industry.

The objective ordinary course of business exception goes beyond what is normal between the debtor and creditor. "[O]rdinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealing so idiosyncratic as to fall outside the broad range should be deemed extraordinary and therefore outside the [exception]." <u>Molded Acoustical</u>, 18 F.3d at 220 (internal citation omitted) (internal quotations omitted) (emphasis omitted). Hence, the objective

component requires proof that the transaction comports with
practices in the relevant industry.  Kaye v. Agripool, SRL (In re
Murray, Inc.), 392 B.R. 288, 298 (B.A.P. 6th Cir. 2008).  This is
not an exacting standard.  Rather, a creditor has "considerable
latitude in defining what the relevant industry is, and even
departures from that relevant industry's norms which are not so
flagrant as to be 'unusual' remain within [section
547(c)(2)(B)]."  Molded Acoustical, 18 F.3d at 226.

However, the transaction at issue cannot be an aberration
when analyzed in the context of the relevant industry.  Murray,
392 B.R. at 298.

In this case, the Defendant asserts that it is classified
under the North American Industry Classification System ("NAICS")
as an employment agency in the administrative and waste
management services industry.  However, the Trustee argues that
there is a dispute as to the proper NAICS classification because,
during discovery the Defendant supplied a set of Risk Management
Association ("RMA") documents for the "temporary help services"
industry.  The Defendant also failed to provide a sufficiently
detailed interpretation of the RMA report and its application to
the issues in this case.

The Court agrees with the Trustee and finds that this raises
a material dispute regarding the Defendant's proper industry

classification.  Although expert testimony is not required, a
sufficiently detailed basis is needed to establish the relevant
industry.  See Stanziale v. S. Steel & Supply LLC (In re Conex
Holdings, LLC), 518 B.R. 269, 285-87 (Bankr. D. Del. 2014)
(explaining that, although expert testimony is not mandatory,
there should be sufficient statistical data or supporting basis
for the evidence related to the objective standard).  Therefore,
the Court will deny summary judgment on this issue.

>2.   Subsequent New Value Defense

Assuming that the ordinary course of business exception
applies to some payments, the Defendant asserts that the
remaining Transfers fall under the subsequent new value defense.

Creditors can use the subsequent new value defense as a safe
haven for certain transfers made during the preference period.
Section 547(c)(4) prevents a trustee from avoiding a transfer to
a creditor from a debtor

>to the extent that, after such transfer, such creditor
>gave new value to or for the benefit of the debtor –
>        (A) not secured by an otherwise unavoidable
>        security interest; and
>        (B) on account of which new value the debtor
>        did not make an otherwise unavoidable
>        transfer to or for the benefit of such
>        creditor.

11 U.S.C. § 547(c)(4).

"New value" is "money or money's worth in goods, services,
or new credit, or release by a transferee of property previously

21

transferred to such transferee in a transaction" that a debtor or
trustee cannot void under applicable law.  11 U.S.C. § 547(a)(2).

> The subsequent new value defense is intended to
> encourage creditors to work with companies on the verge
> of insolvency.  In addition, it is designed to
> ameliorate the unfairness of allowing the trustee to
> avoid all transfers made by a debtor to a creditor
> during the preference period without giving any
> corresponding credit for advances of new value that
> benefitted the debtor.

Proliance, 514 B.R. at 430 (internal citation omitted).  The idea
is that the transfers do not harm the estate or other creditors
because the new value's effect on the estate is the same as the
transfer's value.

Courts in this district have adopted the "subsequent
advance" approach that allows a new value defense for both paid
and unpaid invoices that are not "otherwise unavoidable
transfer[s]."  AFA Inv. Inc. v. Dale T. Smiths & Sons Meat
Packing Co. (In re AFA Inv. Inc.), Adv. No. 14-50134, 2016 WL
908212, at *3 (Bankr. D. Del. March 9, 2016); Proliance, 514 B.R.
at 438; Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.), 416
B.R. 123, 130-31 (Bankr. D. Del. 2009).

Here, the Defendant applied its new value analysis to
Transfers that occurred outside the ordinary course of business
pursuant to the range and the batch methods, respectively, as set
forth above.  According to the Defendant, the total new value is
$65,588.10.  It is the Defendant's position that only $27,801.66
or $27,560.62 in Transfers remain after the new value exception

22

is applied.

The Trustee asserts that the Defendant's new value defense
cannot be decided until this Court determines whether the
ordinary course of business defense applies.

The Court agrees with the Trustee.  The Defendant's new
value calculations were based on the remaining Transfers being
"otherwise unavoidable" according to its calculations under the
ordinary course of business defense.  However, the Court has
found that there are disputes as to material facts regarding the
ordinary course of business defense.  Therefore, the Court must
deny the Defendant's Motion for Summary Judgment as to the new
value defense until the ordinary course of business defense is
determined.  See, e.g., Pillowtex, 416 B.R. at 131 (denying the
creditor's request for "the court to determine its maximum
liability based on the subsequent new value defense, before the
application of other defenses," because it could not decide if
the debtor's payments to the creditor were "otherwise
unavoidable") (emphasis omitted).


IV.  CONCLUSION

For the reasons set forth above, the Court will deny the
Defendant's Motion for Summary Judgment.


23

An appropriate order follows.


Dated: April 13, 2017          BY THE COURT:

_Mary F. Walrath_
Mary F. Walrath
United States Bankruptcy Judge